Case number 20-5513 Ingram Barge Company LLC versus Louis Dreyfus Company LLC. Oral argument is not to exceed 15 minutes per side. Mr. Reisman for the appellant. Hi, good morning. May it please the court? I'm David Reisman. I represent Ingram Barge Company. On this appeal, I'd like to reserve three minutes for rebuttal, please. You may. Thank you. This appeal deals with the district court's granting of a motion to dismiss on Rule 12b-2 for lack of personal jurisdiction. As we've set forth in our briefs and as I will explore further today, that ruling was incorrect both procedurally and substantively. You know, when we prepare for these motions, these arguments, it really forces you to distill the issues and see them much more closely than you do even at the briefing. And I think that we've probably overly complicated by relying on maritime concepts and labels. At the end of the day, when you distill this case down to its barest essence, it's simply an action to enforce a contract. Nothing more, nothing less. The labels we can put aside. These are basic facts, basic legal principles. The issues before the court today are simple. There are two questions. First is the contract, that is the bill of labor, grain transportation, that contract brought in the answer clearly. That contract that it applied to many people, it applies not just to the contract. Mr. Reisman, I'm sorry to interrupt you, but I'm getting a little feedback from him. Are the other judges as well? I hear everything. I don't know if there's anything we can do. Maybe if everybody mutes except you, maybe that'll help. I'm not sure. I'm getting the echo, Judge, so I'm not sure where that's coming from. Okay. Well, you may continue. Just wanted to let you know we're having trouble. All right. Have you been able to understand me? I'm happy to restart if whatever suits the court. I could understand you. I could too. Okay. Well, then I'll continue then. So again, as I was saying, the first issue is whether the contract itself contains terms that are broad enough to encompass LDC. The contract clearly states that it applies to not just the consignee, which LDC spends quite a bit of time refuting that its status is consignee, but it also applies to the owner of the cargo. It's undisputed that LDC owned the cargo. It applies to the holder of the bill of lading. It's undisputed that LDC held the bill of lading, and it applies to any entity that had an interest in the cargo. It's undisputed that as owner of the cargo, LDC had an interest in the cargo. Can I ask just a general background question? Because you talk about normal contract principles, it does seem a little unusual to me to have the shipper and the carrier agree to what a third party's obligations are. Usually a contract is between two consenting parties. So at what point did they become parties to the contract? That's a great question, and I have a very clear answer. They don't become bound just because we say that they're a party to the contract or that they fall within the scope. They become bound at the point in which they take some action to manifest their consent to being bound. And in this case, and that's a well-settled matter of maritime law, any number of cases, including the cases cited by LDC, established that a consignee, for example, accepts the terms of that contract, bill of lading, it accepts delivery of the cargo at issue. And it's that fundamental concept of acceptance by performance that applies here. So contrary to LDC's assertion, we don't say they became bound when we wrote the contract. We say they became bound at the moment that they, with advanced notice of the terms, made the decision to buy the cargo, not reconsign the cargo, accept delivery of the cargo, and then pay demerge pursuant to the bills of lading. All of those actions by LDC, not by Ingram, not by the consignee, but by LDC itself, constitute acceptance by performance and meet the maritime law and general contract rules for acceptance by performance. So is your view, is it essentially any party who accepts the goods, no matter who it is, will always be bound by the contract? No, that's not at all my position. Sure. First, they have got to fall within the confines of the agreement itself. So for example, LDC cited a case for the proposition that even the consignee may not be bound when it accepts delivery of the cargo. That was in the Norfolk Southern versus Groves case. In that instance, the alleged consignee was not a consignee because it never knew it was identified as a consignee, never agreed to be to accept the status as consignee, and in fact was never the owner. They were merely a warehouse package. In our case, what we have is undisputed facts that LDC owned the cargo, was the intended recipient of the cargo, and the party that actually received the cargo. You couple those, the terms of the bill of lading, clear as a matter of matter that they are bound to those terms. In that regard, the district court made much of the notice party issue. How does that fit in with what you're just talking about? In a couple of ways it fits in. First off, Judge Guy, I would point out that you wrote an opinion about six months ago in Malone versus Stanley Black and Decker, where you addressed a very important issue. Here's the issue on briefs and declarations. It's not an evidentiary. It must accept the evidence presented by the non-moving party in this case. Here, what Ingram presented with the declaration from its director of private commercial sales, Matt Tomeko, stating clearly that the notify line as used in this context doesn't refer to a traditional notify party that may be used in a regulated railroad case from the 1800s, for example, in the North Pennsylvania case, but instead it means the party to whom the are being delivered, the actual owner of the cargo. This particular usage and custom, that's what notify means, and Mr. Tomeko explained that clearly. The district court, in violation of the Sixth Circuit's command on how to handle issues like this, completely disregarded that testimony and ignored it. I think that's improper. More importantly, what I would say is that here, unlike most of the cases cited, involved regulated industries, typically waterships, railroads, regulated entities that fall within a number of statutory regulations, including the Pomeranian, which they've cited, 49 USC 80101 for the proposition that a consignee is the party who is named as the consignee on the bill of lading, and they would argue that our inclusion of the party on the notify line is invalid. That's incorrect. Pardon me, counsel. Judge Guy, can you turn the volume down on your device or mute your device? I believe the echo is coming from your end. If I mute my device, I won't hear it. No, sir, I just mean your microphone. If you could just mute your microphone when you're not speaking or turn the volume down on your device. Just a second. Okay. I mean, now I can't hear at all. Judge, are you able to hear me, Judge? Hello? Judge Guy, can you hear me okay? Yes, now. Okay. Okay. So, finishing, Judge Guy, response to your question. So, the facts on which LDC and the district court relied are not applicable here because the statutes they relied on, 49 USC 80101, only applies to common carriers. That's set out in 49 USC 80102, the application provision of that particular act. So, the fact that they were the notified party, as we've explained, is sufficient based on the declaration that we provided. I think more importantly, however, what we would point out is that regardless of whether LDC is ultimately found to be the consignee does not impact the end analysis because we only have to prove that they were one of four things, the owner, the consignee, the holder of the bill of lading, or an entity that had an interest in the cargo. So, unlike the cases that LDC and the district court cited where the only means by which the party could be rely on a finding of consignee status. The other thing I would point out is that the bill of ladings at issue here are negotiable bill of ladings. LDC pointed out incorrectly to the court that these bills of ladings were made out to the grain sellers, Coffco and Green Plains. That is factually false. The bills of lading at issue were made out to the order of Green Plains and Coffco, making these negotiable bills of lading. In the North Pennsylvania case that was relied on heavily by the district court and by LDC, the court never said that a party that's identified as a notify party can never become the consignee. It merely said in that setting, the 1800s cattle trade involving railroads, a regulated industry, that's what notify meant. But here, even if you ignore the declaration evidence that Mr. Tameka provided on behalf of Ingram, we still are left with the fact that it's undisputed that the bills of lading were consigned to LDC, making them the consignee. And those are facts that at this stage of the proceedings, given the lack of an evidentiary hearing, the district court should not have disregarded, and frankly, this court should not disregard. How does it usually work with negotiations? When I think of a negotiable bill, I think of actually signing it over. And here you say it doesn't matter, but isn't that form important to know who actually is the consignee or the owner of the bill of lading? With the negotiable bill of lading, the party that's entitled to accept delivery is the holder of the bill of lading. Is it a matter of good or bad? No, it's not. So who was the holder? And I saw that Second Circuit case you cited under applied refund. Holder is enough. Generally, I think that that case was standing for the proposition that maybe a bank or something owns the property at some point, and then the purchaser has to go pay off the debt and get the bill of lading. Is that factually what happened here, that LDC actually took possession of the bill of lading? And then when you showed up with your bill of lading, give me the bill of lading. I'll give you the goods. Correct. And that's set forth. That's exactly right. The holder of the bill of lading in this instance was LDC because it was the owner of the cargo. And as we stated in our declaration, the bill of lading was negotiated to LDC before we tendered delivery, before they accepted delivery. So those facts create the difference between the cases relied on by LDC. But again, I want to think they clearly were the consignee. But even if they were not the consignee, that doesn't mean we don't win. We still clearly win on the basis that they were the holder of the bill of lading, undisputed, the owner of the cargo, undisputed, and an entity with an interest in the cargo, undisputed. So whether they were or were not a consignee, again, as a matter of professional pride, I want the court to find that they were because I believe that's the case. But it's not necessary for the court to rule in Ingram's favor here. There is this case and other cases raising the same issue. You had a long time relationship with this company. And what changed? You must have been doing this kind of thing for a long period of time. What suddenly changed to trigger all these cases? Sure. That's a great question, Judge. What changed was that Ingram decided that they wanted to change the way that certain charges were going to be handled. And in order to do that, again, this is not an instance where Ingram unilaterally tried to create a contract that would be a surprise to LDC. Ingram created this contract. They wrote the words, the language they wanted. They then sent it to LDC in April of 2019. Before the first transactions involved in this case, they sent those terms to LDC. And it clearly states that you as the owner of the cargo, a consignee, holder of the bill of lading, or a party with an interest are subject to paying these charges that are incurred not for our benefit and not as part of the transportation, but after we deliver a barge to the destination point in Louisiana, they're third party charges that are incurred. And Ingram felt those charges were appropriately payable and owed by these parties that are identified in the contract. And so we put them on notice. And when we put them on notice, as the courts have said, LDC had any number of options. There were several forks in the road where they could have said, you know what, we don't like those terms. We're not going to buy cargo in Ingram's barges. They could have told their sellers, we don't want Ingram's barges. They could have after reconciled those barges to third parties. These are fungible commodities. These barges and these grains are conveyed and resold many times during the course of the transportation down the river. So Mr. Reisman, let me jump in here. So maybe now I understand what's happened. So these warfage charges and these other sort of post-transportation charges were not, those are new. In the long history of your business, you have not collected those from LDC and other holders of the bill of lading. But you've changed those terms. Now you say you notified them of those changes, but that's what's provoking this dispute. That's correct, Your Honor. Okay. Thank you. Questions from any of the other panel members? No? All right. Mr. Reisman, thank you for your argument. Yes, Marshall. Judge Guy, are you using an iPad? Yes. Okay, Judge, can you mute your mic when you're not speaking? Because we're getting a feedback echo, and I believe it's coming from your feed. The way that you did- Just one second. When you say mute my mic- Yes, sir. If you tap the screen, you should see a microphone. Is that what you're talking about? Yes, sir. If you could just mute, Your Honor, when you're not speaking, just to eliminate that feedback. Thanks, Your Honor. All right. We will now hear from Mr. Pepper. Thank you, Your Honor. May it please the court, I am Patrick Pepper, and I represent Louis-Dreyfus Company. We request that the district court's dismissal be affirmed. The reason that the district court was correct and the reason we request for affirmance is because the bill of lading or bills of lading that are the basis of the lawsuit contain a agreed-upon form selection clause that doesn't include Louis-Dreyfus's agreement. In the history of the enforcement of agreed-upon waivers of personal jurisdiction, the cases show that you actually need to agree to that. Here, the bills of lading, while they contain incorporated green transportation terms, were entered into by separate parties. They were which were selling grain on what's called a cost insurance and freight term. In the industry, it's referred to as SIF. That's important because the last term there is freight. At the end of the argument in chief, when it was explained how we got these cases rising up and why these disputes are starting to arise, the SIF trade has involved the sellers paying for freight. That includes the charges that Ingram, for example, is now attempting to exclude from freight and charge to people downstream or later in the chain of commerce. That is the basis of the dispute and it is why the fundamental terminology in the bills of lading and this long-standing practice is so critical. The use of the word notified party, as contrasted with consignee on the face of the bill of lading, is significant because under the typical bill of lading jurisprudence, a bill of lading is a contract between the shipper, in this instance, Cofco or Green Plains, and the carrier, in this instance, Ingram. In some instances, a consignee could become party through a quasi-contract theory, but in this instance, Louis-Dreyfus is only a notified party and for many, many years, a notified party has signified that it is not a consignee. Do you admit that it is a negotiable bill of lading? It does have pay to the order of, Your Honor. It is negotiable. Do you not think that a party who is, do you think by putting it on the notified line that you automatically exclude any ability to become a consignee through negotiation? I do not automatically say that that is always the case, Your Honor. In this case, it is not the situation that whether it is notified party or consignee, either way that is a SIF contract and on the faces of each of the bills of lading, it is demarked as prepaid. And that is to signal to the recipients of the goods, ultimately, or eventually, it ended up being Louis-Dreyfus, that the freight has been prepaid. But isn't that a merits dispute rather than a personal jurisdiction? So you might have a really good argument that under the bill of lading, you don't have any obligations because of this term that says you're not required to pay anything. But that goes to just kind of the meaning of the contract, not whether the contract is binding on you. I would agree that the prepaid designation, as it reflects to liability, gets to merits, but it goes back to the original undisputed portion of the evidence that this is a SIF contract and that everything that the court sees in front of it is consistent with a SIF contract. And that by the receipt of the bills of lading, Louis-Dreyfus was only accepting the performance which it had paid for. It was accepting the delivery of title to goods that it had paid in the SIF contract to be delivered to it. It was not an offer from Ingram for a new contract where we would agree to personal jurisdiction waivers or any additional liability. The fact is that when a buyer in the course of a SIF contract receives title, that is the act of performing it provided that it is in fact delivered in prepaid. All the prepaid designation was reflected to show you, Judge Murphy, was that what you're seeing and on the face of the bill of lading is what the party's intended with the SIF contract and why Louis-Dreyfus is not a party to bills of lading. I assume you have a separate contract with the sellers, so that's the SIF contract. Presumably you could implead or sue them to seek any recourse if you're found liable here because you have this separate contract with the seller saying they're responsible for all charges, but why did that SIF notation or concept get built into the bills of lading so as to not even make you a contracting party to the bills of lading, even though it seems under abnormal admiralty you're holding up the bill of lading makes you kind of an entity that's bound by it. Your Honor, I would disagree with that because even consignees or notified parties, to the extent they are only third-party beneficiaries of the contract, do not agree, do not have, to your original question right out of the gate, do not have obligations imposed upon them by a contract entered into by two separate parties. So it's the theory of even if the notified party here, Louis-Dreyfus, becomes a third-party beneficiary, the only way the cases have suggested that we can manifest assent to those terms is to sue under them and attempt to take advantage of those terms. We have done neither. All that Louis-Dreyfus has done and all the record reflects is that Louis-Dreyfus received the performance which it was due. It did not. Wait a minute. So suing under them is a way that you could manifest assent and there are cases that say you manifest assent by trying to take advantage of the terms by suing under them, but there aren't any cases that say, go the further step to say if you don't sue under them or suing under them is the only way that you can manifest assent. Like surely you're the of the bill of lading that entitled you to the ownership of the goods and to pick them up. I guess I don't have a case that tells me you're not bound. I have cases that say if you sue under them, you are manifesting assent, but why aren't you also manifesting assent by just being the holder of the bill of lading and going and picking up the goods? Because there's no opportunity to negotiate or become party to the contract when all that the party is doing is receiving the performance which they've paid for. In other words, the goods were delivered. We picked them up. That was what was bargained for. There was no bargain or agreement with Ingram and therefore there is no manifest to assent to an agreement to Ingram because we never made an agreement or had an offer acceptance. I think their response would be, I suppose, that you had a right not to accept the goods, but it's the acceptance of the goods off the carrier that shows your assent to the terms that the carrier has provided. The carrier is essentially saying, yeah, I'll give you the goods, but you have to accept all these terms in the bill of lading in order to receive the goods. It's undisputed here that you did accept them. Why isn't that somewhat consent to be bound by contract? Judge Murphy, I don't think that's the way the facts went. The bill of lading, I believe, probably came from the seller and said, here is your title to your goods. Then when they showed up in New Orleans, they were received by Louis-Dreyfus. It was marked prepaid and the goods became ours, which we had paid for and paid for the delivery obligation. It was not as if somebody came to us and said, I understand that the seller or Ingram came to this delivered contract. We've got this ship in the port of New Orleans that is for you, and here are your documents of title. Do you accept it? It was, no, here's the prepaid documents of title. Accept your performance and the contract then would have been fulfilled. In that way, I think it's a little different than the hypothetical you laid out. Well, I guess you still, once the seller sent you the bill of lading, essentially saying, these are the terms, and it very well could include a prepaid term that is quite beneficial to you and shows you have no liabilities for these separate demerge charges or whatever. That, again, goes to the merits. The key question here is whether just your acceptance of the, I guess it's a two-step, the acceptance of the bill of lading from the seller, raising no dispute to the bill of lading, and then acceptance of the goods from the carrier, I assume, for the exchange of the bill of lading. That two-step process still could show a manifestation of your intent to be bound by the general contract of transportation. Well, I don't think that's what the cases would suggest, that those one-step or two-steps, however it's characterized, is sufficient to manifest assent to a contract that you didn't negotiate or freely enter, particularly when we're talking about expanding fundamental rights like personal jurisdiction. I think the expansion of personal jurisdiction through some sort of situation like this where all a buyer is doing is accepting their performance, not accepting a new offer, is a different situation altogether than the manifestation of assent. So, is it your argument that there's something unique about waivers of personal jurisdiction that, I mean, you didn't argue that to the district court or in your brief that, in other words, any other term would be fine, but not personal jurisdiction? Is that the argument you're making now? No, I think this is simply an amplification of the argument that personal jurisdiction is a fundamental due process right, which we did argue in our brief, that the Burger King case and the discussions of the Burger King case suggest that that is something that is a negotiated, commercially negotiated type provision. It is not something that is, I don't think the cases say that personal jurisdiction waivers are implicitly waived in this type of context, at least the cases I've cited and argued in the brief. I have a question. When is delivery considered completed? And as a second part of that question, were any of these charges at issue incurred after the goods were dropped on the wharf? Your Honor, as to the second question of when the charges were incurred, I don't believe the record reflects when they were occurred. If they were at the wharf or not, as far as when delivery occurs, delivery occurs once it is finally delivered and offloaded into the possession of Louis-Dreyfus. There's all sorts of things that happen in the process from loading all the way through to delivery, but I think as you're using delivery, it's ultimately when Louis-Dreyfus becomes in possession. None of these charges at issue were incurred after you took possession? Your Honor, I don't know the answer to that. I believe some of them, but not all of them, may have been incurred after Louis-Dreyfus took possession. I don't know the invoices well enough to tell you exactly what happened in New Orleans for these charges. That raises a question for me. When you say this was a prepaid arrangement, would prepayment include charges incurred after delivery? Yes. It should be built into the agreement. If Ingram wants to recover for additional charges after the fact and does not build the full charges into its original contract, that's a choice it makes. As Judge Larson identified earlier in the argument, this is a new set of charges that are attempted to be collected. Typically, they've been included in the original freight contract. Now, recently, that's been attempted to be changed. But counsel, do you dispute that they sent the charges to you or the new terms? I think it was April 19th is the date that sticks in my mind, via email and said, hey, I want you to know these are our new charges. At least the only evidence we have in the case, which is the affidavit from Ingram Bard, suggests that that is true when you didn't put in anything to the contrary. That's correct, Your Honor. We do not dispute that they sent that email. In fact, that's why the bill of lading appears the way it does, with the consignor and consignee being the seller and Louis-Dreyfus being the notified party, so that it is clear the financially responsible party is the seller in this instance, the shipper, the party that entered into the agreement with Ingram Bard. Okay. I see your time has expired. Judge Murphy, Judge Guy, any further questions? No. Okay. We'll hear rebuttal. Thank you, Judge. I just have a few points that I'd like to address. One, I think, Judge Guy, this may go to your line of questioning. Mr. Pepper argued that essentially they can't be bound here because this contract was prepaid on SIF terms. As we've said very clearly, both in our pleadings and in our complaint and in our declaration, the charges at issue here are not freight. These are not transportation costs incurred to get the cargo from Illinois, for example, to New Orleans. These are charges that are incurred after the barge is dropped by Ingram at the destination. It incurs additional charges after it's left our custody control and possession. It incurs those charges. Clearly, those aren't freight. But more to the point, in terms of Mr. Pepper's argument that, and again, I do believe, Judge Murphy, you're correct, these points go to the merits, but I just feel compelled to address them, is Ingram's terms specifically say that these charges are payable by parties such as LDC, for all the reasons I've enunciated before. These are charges we couldn't know whether and how much were going to be incurred until the barge has been dropped. So the idea that would be freight prepaid and that that would include these charges is impossible. We've said they're responsible for them. We couldn't possibly quantify them because until the barge is dropped, it's out of our control how many movements it's going to incur. This is just a pragmatic question, but why didn't you, did you seek recourse from the sellers since it seems undisputed that a SIF contract would ultimately make them responsible, even if LDC has to pay you, then LDC can seek recourse from the sellers. Why cut out the middleman and just go after the sellers? I can't honestly, Judge, I don't know what Ingram's business reasons are for doing it this way. What I do know is that they intentionally wrote the contract in a way that they would have this right. They sent it to LDC. It was accepted, it was bound, et cetera. And that's what they've chosen to do. If LDC has rights against their seller, that's between them and their seller. And we have no say over that, but we have our contractual right against LDC. And this was the option that we chose to go down. Because I'm running out of time. So I wanted to address a couple other things. Mr. Pepper also said that LDC did not take advantage of the terms, but clearly they did. They took advantage of the terms in the most fundamental way. They accepted delivery of the cargo. That was really the only thing that they stood to benefit from in this contract was receipt of the goods, and they accepted it. They claimed the one and only benefit that a party in their position could have, and they did that without dispute. He also mentioned that they didn't have an opportunity to negotiate. That's simply not true. For the cases we cited, for example, Nielsen versus Jessup, Mitsui versus Allied, Pacific Coast Fruit and Pennsylvania Railroad, McClay, AP Moeller, they all clearly say that there is a remedy in this situation. The remedy is to refuse to accept the cargo. They chose not to do that. In the Nielsen case, the court specifically said to avoid this responsibility, he must either refuse acceptance or find some other person who both as vendee of the goods and as assinee and holder of the bill of lading becomes substituted in his place and to his rights and liabilities. They had that opportunity to do that. By the way, that's 30 Fed 138 at 140. Okay, Mr. Reisman, I think your rebuttal time is up if you'd like to just wrap up in a sentence. Yeah, absolutely, Judge. I think we've clearly shown that this is a contract that was broad enough to apply to LDC. They accepted the terms by their own affirmative actions. They became bound. There is no basis on which to say that the form selection clause should be treated differently than any other term in this contract. They are therefore bound. The district court aired both procedurally and substantively should be reversed and the motion to dismiss should be not denied. All right. Thank you both for your arguments today. We will consider your arguments and the case is submitted.